## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| FLEETWOOD ACQUISITION CORP., *et al.*,[1] | Case No. 19-12330 (KG) |
| Debtors. | (Joint Administration Requested) |

### DECLARATION OF OCTAVIO DIAZ, CHIEF RESTRUCTURING OFFICER OF FLEETWOOD ACQUISITION CORP., *ET AL.*, IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Octavio Diaz, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.     I am the Chief Restructuring Officer of Fleetwood Acquisition Corporation ("Acquisition"), Fleetwood Industries, Inc. and High Country Millwork, Inc. (collectively, the "Debtors").  In my capacity as Chief Restructuring Officer of the Debtors, I am familiar with the Debtors' day-to-day operations, books and records, business, and financial affairs.

2.     I submit this Declaration in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and motions filed on the date hereof seeking various types of "first day" relief and to provide an overview of the Debtors' business and their need for protection under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Fleetwood Acquisition Corp. (3051), Fleetwood Industries, Inc. d/b/a Fleetwood Fixtures (7530), and High Country Millwork, Inc. (7294).  The mailing address for the Debtors, solely for purposes of notices and communications, is: 4076 Specialty Place, Longmont, Colorado 80504.

3.      Except as otherwise indicated, all facts in this Declaration are based upon my personal knowledge, my discussions with the Debtors' management team and advisors, including Bayard P.A. ("Bayard"), my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and/or my opinions based upon my experience and knowledge.  I am over the age of 18 years and duly authorized to submit this Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

4.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, as well as certain motions and other pleadings (collectively, the "First Day Motions").  I am authorized by the Debtors to submit this Declaration on their behalf in support of the First Day Motions.

5.      The First Day Motions are intended to enable the Debtors to operate effectively and efficiently within these chapter 11 cases, as well as to avoid certain adverse consequences that might otherwise result from the commencement of these cases.  Among other things, the First Day Motions are designed to meet the Debtors' goals of: (i) continuing their operations in chapter 11 with as little disruption and loss of productivity and value as possible; (ii) maintaining the confidence and support of their customers, employees, vendors and service providers; and (iii) establishing procedures for the smooth and efficient administration of these chapter 11 cases. I have reviewed the First Day Motions, and it is my belief that the relief sought therein is necessary to (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operation of, the Debtors' business, and (b) maximize and preserve the value of the Debtors' chapter 11 estates.

6.      This Declaration provides an overview of the Debtors' business, capital structure, the proposed use of the cash collateral of the Prepetition Secured Lender (as defined below), and

the circumstances giving rise to the commencement of these chapter 11 cases, and summarizes the relief requested in each of the First Day Motions.

## THE DEBTORS' BUSINESS

7.      Fleetwood Industries, Inc. (d/b/a Fleetwood Fixtures) ("Fleetwood") and High Country Millwork, Inc. ("High Country") are leading providers of customized fixtures and displays, with decades of experience serving a wide variety of customers in the retail and hospitality industries.  Fleetwood and High Country are full service fixturing companies beginning with creative and collaborative design services and continuing through the manufacturing and installation processes.

8.      The companies were consolidated under Acquisition in 2014 and, following certain operational and financing restructuring initiatives in the following years, the companies' performance substantially improved.  By 2018, the companies had substantially stabilized their operations and together achieved $70 million in sales.  Fleetwood invested heavily in a new manufacturing space in 2018-2019 to service its growing business and customer needs.

9.      Unfortunately, in 2019 as a result of the certain tariffs instituted against China and other headwinds in the retail industry, certain of the Debtors' customers began delaying orders, significantly extending project timelines, and slow paying certain receivables.  At the same time, the Debtors' overhead expenses increased due to the Fleetwood expansion and certain of the materials utilized by the Debtors became more expensive due to the tariffs.

10.     The combined effect of these circumstances on the Debtors' operations and balance sheet led the Debtors to look for additional financing in recent months.  After exhausting this process without locating a financing source, the Debtors determined that their best path forward was to effect an operational and financial restructuring under chapter 11 of the Bankruptcy

Code.  The Debtors intend to use these cases to streamline their operations and to prosecute a plan of reorganization that will permit the Debtors to emerge as a strong business partner for their many valued customers and suppliers.

11.      A chart reflecting the Debtors' corporate structure is annexed hereto as **Exhibit A**.

### **CAPITAL STRUCTURE**[2]

12.      The Debtors  and Fixtures Holdings, L.P. (the "Prepetition Secured Lender") are parties to that certain Revolving Credit and Term Loan Agreement, by and among the Prepetition Secured Lender (as successor in interest to Citizens Bank of Pennsylvania) and the Debtors, dated as of September 19, 2014 (as amended, restated, or otherwise modified from time to time, the "Prepetition Credit Agreement").  Under the Prepetition Credit Agreement, the Debtors received a revolving credit facility in two tranches, a term cash loan, and a term PIK loan.   The Prepetition Secured Debt is secured with valid, binding, enforceable, non avoidable, properly perfected, first-priority liens ("Prepetition Liens") on substantially all assets of Debtors Acquisition and High Country.  As of the Petition Date, there is at least $51,259,427 in principal and interest outstanding under the Prepetition Credit Agreement.  The Debtors are in default under the Prepetition Loan Documents with respect to their material obligations thereunder.   The Prepetition Secured Lender has affirmatively consented to the proposed use of cash collateral in connection with the proposed cash collateral order.

13.       The Debtors and Brookside Mezzanine Fund III, L.P. ("Brookside") are also parties to that certain Term Loan Agreement, by and among Brookside and the Debtors, dated as of September 19, 2014 (as amended, restated or otherwise modified from time to time, the

---

[2] The summary of the loan documents and security agreements set forth herein is qualified in its entirety by the documents themselves.  To the extent there is a discrepancy between the descriptions set forth herein and the documents, the documents control.

"Brookside Mezzanine Loan").  As of the Petition Date, there is approximately $9,826,845 in principal and interest outstanding under the Brookside Mezzanine Loan.  The Brookside Mezzanine Loan is not secured by liens upon any of the Debtors' assets.

14.    Finally, Acquisition and the Prepetition Secured Lender (as successor in interest to Grey Mountain Partners Fund III Holdings, L.P.) are parties to that certain Amended and Restated Subordinated Promissory Note, dated as of May 30, 2017 (as amended, restated, or otherwise modified from time to time, the "Fixtures Subordinated Debt").  As of the Petition Date, there is approximately $8,756,074 in principal and interest outstanding under the Fixtures Subordinated Debt.  The Fixtures Subordinated Debt is not secured by liens upon any of the Debtors' assets.

15.    The senior priority of the Prepetition Secured Debt is dictated by that certain Intercreditor Agreement, by and among the Debtors, the Prepetition Secured Lender, and Brookside, dated as of September 19, 2014.

16.    Fleetwood and High Country are 100% owned by Acquisition.  Acquisition is owned 93% by the Prepetition Secured Lender, 4.23% by Brookside, and 2.23% by Citizens Bank of Pennsylvania, with remaining small amounts of equity owned by individuals.

17.    As of the Petition Date, the Debtors estimate that they owe approximately $7.4 million in trade debt.

**<u>EVENTS LEADING TO THESE CHAPTER 11 CASES</u>**

18.    As noted above, Fleetwood and High Country were acquired by Acquisition in 2014 by. In the following year, the companies' sales grew; however, the companies then encountered operational challenges that resulted in a capital restructuring in 2017.  Through such restructuring, certain of Acquisition's shareholders and subordinated lenders purchased the Debtors' senior indebtedness and provided additional credit to the Debtors to support an operational turnaround.

In 2018, the Debtors' operations had stabilized.

19.     Then, in early 2019, some of the Debtors' customers unexpectedly began delaying orders and pushing out project timelines.  Many of those customers are retailers who reported that the newly instituted China tariffs were negatively impacting their sales and profit margin projections.  This, in turn, led such customers to slow their store expansion and refurbishment plans, defer new projects indefinitely, and reduce the scope of existing projects.  This caused a significant decline in the Debtors' revenue. Indeed, the Debtors project a combined decline of approximately 50% in revenues from 2018 to 2019.

20.     Customers also began to delay payment or to challenge invoices in unusual ways, presumably to address their own cash flow issues.  At the same time, the Debtors' liabilities to suppliers and internal overhead ballooned as the Debtors continued to work to fulfill customer orders for which payment was now being delayed or withheld.

21.     Notwithstanding these challenges, through the first half of 2019, many customers generally expressed hope that the industry outlook would improve and reassured the Debtors that their store expansion and refurbishment plans would go forward.  In a diligent effort to maintain their business, the Debtors have managed to retain and fulfill orders with most of their customers.

22.     To further preserve the ability to serve customers and remain in business, the Debtors made numerous efforts (which are still ongoing) to proactively address the market decline. These difficult initiatives have included revising their internal overhead structure, rationalizing their workforce, delaying capital expenditure plans where possible, and negotiating credit terms and extended payment plans with suppliers.  The Debtors have reduced their workforce over the last year, including a layoff of forty-eight (48) employees at Fleetwood and fifteen (15) employees at High Country on October 29, 2019.

23.     As the tariffs continued and escalated, however, the retail industry has been even more severely impacted.  The correlative effect on the Debtors meant that while their liabilities to suppliers and creditors steadily increased, income declined.

24.     Over the past several months, the Debtors have actively sought financing to support their working capital and cash demands, including seeking additional financing from their senior lender, equipment finance companies, accounts receivable factoring lenders, and other potential asset-based and cashflow lenders, but none of those lenders were able to underwrite or approve a loan due to the Debtors' current financial condition and the industry outlook.  The Debtors also recently explored potential business combination opportunities that might result in a stronger combined balance sheet.  These discussions did not present a path forward and one of the potential partners actually ceased its own operations after suffering the same challenges.

25.     As a result of these circumstances, Debtors determined that bankruptcy protection under chapter 11, and its attendant breathing spell, was their only viable option.  The Debtors intend to utilize the chapter 11 process to further right-size and streamline their businesses with the goal of emerging as a profitable enterprise to service their customers, maintain their employees and act as a go-forward business partner with their suppliers.  As a part of this process and to maximize value, the Debtors intend to institute procedures as quickly as possible to liquidate certain inventory, raw materials, and equipment at their Pennsylvania location.

## SUMMARY OF FIRST DAY MOTIONS[3]

26.     To minimize the adverse effects of the commencement of these chapter 11 cases, the Debtors have requested a variety of relief in the First Day Motions filed concurrently herewith.

---

[3]  Capitalized terms used in this section, but not defined, have the meaning ascribed in the respective First Day Motion.

I am familiar with the contents of each of the First Day Motions, and to the best of my knowledge, information and belief, the facts set forth therein are true and correct. I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.

27.    Furthermore, I believe that with respect to the First Day Motions requesting the authority, but not direction, to pay discrete prepetition claims or to continue selected prepetition programs, the relief requested is essential to allowing the Debtors to continue to operate as a going concern and that granting the interim relief described herein is necessary to avoid immediate and irreparable harm to the Debtors and their employees, customers, vendors, creditors, and other stakeholders. The Debtors have an immediate need to continue the orderly operation of their business by securing goods and paying employees in the ordinary course of business. The Debtors' continued operations will enable them to preserve the going concern value of their estates and maintain vendor and customer confidence. A description of the relief requested in and the facts supporting each of the First Day Motions is set forth below.

### A.    Motion to Direct Joint Administration of the Debtors' Chapter 11 Cases

28.    The Debtors have filed several purely administrative or procedural First Day Motions, including a motion to jointly administer the Debtors' bankruptcy cases. Given how closely related the Debtors' financial affairs and business operations are, and the crossover among their creditors, joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.

### B.    Motion Seeking Authority to File a Consolidated List of Creditors

29.    The Debtors also seek authorization to file a consolidated creditor matrix and list of the thirty (30) largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each Debtor.

30.     The preparation of separate lists of creditors for each Debtor would be expensive and time consuming and, therefore, the Debtors request to file a consolidated creditor matrix. Moreover, filing a top thirty (30) will help alleviate administrative burdens, costs, and the possibility of duplicative mailings of required notices to parties in interest.

### C.     Applications to Approve the Appointment and Retention of Stretto as the Claims and Noticing Agent

31.     The Debtors have also requested the approval of a services agreement between the Debtors and Stretto,[4] and the Debtors' retention and employment of Stretto as claims and noticing agent for the Debtors in lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware, effective *nunc pro tunc* to the Petition Date.  The Debtors anticipate that there will be hundreds of entities that will require notice, and many of which are expected to file proofs of claim in the Debtors' chapter 11 cases.  In view of the number of anticipated claimants, parties requiring notice, and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtors' estates and their creditors.

### D.     Motion to Authorize the Debtors Continued Use of Their Cash Management System, Maintain Existing Business Forms, and Authorize the Debtors to Continue Intercompany Transactions

32.     The Debtors seek entry of interim and final orders authorizing the Debtors to: (i) continue to operate their cash management system (the "Cash Management System"); (ii) maintain existing business forms; (iii) continue intercompany transactions in the ordinary course; (iv) granting administrative priority status to post-petition intercompany transactions, (v) authorizing the Debtors to continue using prepetition bank accounts and using debit and wire

---

[4]  Stretto is the trade name of Bankruptcy Management Solutions, Inc. and its subsidiaries.  The Stretto application is supported by a separate declaration of Travis K. Vandell of Stretto.

payments, and (vi) temporarily suspending the requirements of section 345(b) of the Bankruptcy Code.

33.     Because of the nature of the Debtors' business and the disruption to the business that would result if the Debtors were forced to close their existing bank accounts, it is critical that the existing Cash Management System remain in place.

### 1.     The Bank Accounts

34.     The Cash Management System is comprised of two bank accounts (the "Bank Accounts") with Citizens Bank.  The Bank Accounts function as collection, operating, and disbursement accounts.  The Cash Management System and Bank Accounts are organized to facilitate the seamless collection, management, and disbursement of funds used in the Debtors' day-to-day business.  More specifically, the Debtors' operations are funded entirely through the Bank Accounts which are used for, among other things, holding and collecting the Debtors' cash, collecting receivables, making disbursements to third parties, including on account of accounts payable, remitting payments to the Debtors' payroll processor in order to fund payroll and certain related employee benefit obligations, and remitting wire payments and automated clearinghouse transfers.

35.     The Debtors' transition into chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of the Cases with the same account numbers and, where applicable, automated relationship.  The Debtors further request authority to deposit funds in and withdraw funds from the Bank Accounts, subject to the same access rights and limitations existing prior to the Petition Date, including but not limited to checks, wire transfers, automated clearinghouse transfers, electronic funds transfers, and other debits and to treat the Bank Accounts for all purposes as debtor-in-possession accounts.

### 2.      The Debtors' Existing Business Forms and Check Stock

36.      In the ordinary course of business, the Debtors use a variety of checks and business forms.  To minimize expenses to their estates and avoid unnecessary confusion to their employees, customers, and suppliers, the Debtors submit it is appropriate to continue to use all checks, correspondence, and other business forms (including, without limitation, letterhead, purchase orders, and invoices) (collectively, the "Business Forms") as such forms were in existence immediately before the Petition Date and without reference to the Debtors' status as debtors in possession; provided, however, that once the Debtors' existing check stock has been used, any future checks ordered by the Debtors will include the legend "Debtors-in-Possession."[5]  In the absence of such relief, the estates will be required to bear potentially significant administrative expenses, which the Debtors respectfully submit are unwarranted and likely will have little or no attendant benefit to the estates.

### 3.      Intercompany Transactions

37.      From time to time, in the ordinary course of business, resources are shared between the Debtor entities.  These resources include funds, inventory, personnel, and logistics and operational services (collectively, the "Intercompany Transactions").  The Intercompany Transactions result in receivables and payables (the "Intercompany Claims") that are reflected as journal entry receivables and payables, as applicable, on the Debtors' consolidated balance sheet, which nets each entity's Intercompany Claims with the corresponding payable, resulting in a zero dollar balance.  The Debtors track all Intercompany Transactions in their consolidated accounting system and can ascertain, trace, and account for all Intercompany Transactions and Intercompany

---

[5] The Debtors' payroll checks are cut by CheckmateHCM Solutions ("CheckmateHCM"), which utilizes its own check stock.  The Debtors will seek to have CheckmateHCM print payroll checks with a new post-petition sequence number and a reference to the Debtors' status as debtors in possession and bankruptcy case number.

Claims.  The Debtors will continue to track Intercompany Transactions and Intercompany Claims on a post-petition basis.  Disallowing the continued use of Intercompany Transactions would unnecessarily disrupt the Cash Management System and the Debtors' operations to the detriment of the Debtors and their stakeholders.

E.      **Motion Approving the Debtors Proposed Adequate Assurance and Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service**

38.      The Debtors seek entry of interim and final orders (i) approving the Proposed Adequate Assurance of payment for future utility services, (ii) prohibiting Utility Companies (as defined below) from altering, refusing, or discontinuing services, and (iii) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests.

39.      In connection with the operation of their business and management of their properties, the Debtors obtain electricity, natural gas, telephone, internet, water, waste disposal, and other similar services (collectively, the "Utility Services") from several utility companies or brokers (collectively, the "Utility Companies").

40.      Uninterrupted Utility Services are essential to the Debtors' ongoing business operations and the overall success of these Cases.  The Debtors' operations require electricity and gas for lighting, heating, and air conditioning.  Should any provider of Utility Services refuse or discontinue service, even for a brief period, the Debtors' business operations could be severely disrupted.  Accordingly, it is essential that the Utility Services continue uninterrupted during these Cases.

41.      On average, the Debtors pay approximately $34,000 each month for third party Utility Services in connection with their corporate offices and other facilities.

42.    The Debtors intend to pay post-petition obligations owed to the Utility Companies in a timely manner from (i) cash held by the Debtors, an/or (ii) cash generated in the ordinary course of the Debtors' business.  The Debtors submit that these sources will provide sufficient liquidity to pay the Debtors' Utility Service obligations during the pendency of these Cases.

43.    To provide additional assurance of payment, the Debtors propose to deposit into a segregated account $17,000 (the "Adequate Assurance Deposit"), which represents an amount equal to approximately two weeks of the Debtors' average cost of Utility Services, calculated based on the Debtors' average third party utility expenses over the nine months ended September 30, 2019.  The Adequate Assurance Deposit will be deposited into a segregated account no later than twenty business days after entry of the Interim Order and held during the pendency of these cases.

**F.    Motion Authorizing Payment of Wages, Compensation, and Employee Benefits**

44.    The Debtors seek entry of interim and final orders authorizing, but not requiring, the Debtors to (a) pay and/or perform, as applicable, prepetition obligations to current Employees, including accrued prepetition wages, salaries and other cash and non-cash compensation claims, except as otherwise set forth herein (collectively, the "Employee Claims"); (b) honor and continue in the ordinary course of business until further notice (but not assume), certain of the Debtors' vacation, sick time and holiday time policies, workers' compensation, and employee benefit plans and programs (collectively, the "Employee Benefit Obligations"), and to pay all fees and costs in connection therewith, except as otherwise set forth herein; (c) reimburse Employees for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary course of business (the "Expense Reimbursement Obligations"); (d) remit, upon entry of a Final Order, payments to the Terminated Employees in accordance with the Terminated Employee Severance Program, and to

continue the Terminated Employee Severance Program with respect to any current Employees terminated after the date hereof (collectively, the "Employee Severance Obligations"); (e) pay all related prepetition withholdings and payroll-related taxes associated with the Employee Claims, Employee Benefit Obligations, and Employee Severance Obligations (the "Employee Taxes"); and (f) pay all administrative fees, employee contributions, and employer match contributions to the Employee 401(k) plan (the "401(k) Obligations" and, together with the Employee Claims, the Employee Benefit Obligations, the Employee Expense Obligations, the Employee Severance Obligations, and the Employee Taxes collectively, the "Prepetition Employee Obligations").

**1.      The Debtors' Employee Obligations**

45.      In the ordinary course of business, the Debtors incur payroll and employee benefits obligations to their employees for the performance of services.  As of the Petition Date, the Debtors employ approximately 74 individuals (the "Employees"), all of whom are employed on a full-time basis,[6] 59 of whom are compensated on an hourly, non-salaried basis, and none of whom are members of a union.

46.      The Debtors incurred outstanding Employee Obligations and Employee Benefits relating to the period prior to the Petition Date.  Certain of these costs and obligations are outstanding, while others will become due and payable in the ordinary course of the Debtors' business after the Petition Date, most of which will become due and owing before final relief can be granted.

47.      The Debtors do not seek authority to pay any prepetition amount in excess of

---

[6] On October 29, 2019 (the "Separation Date"), Fleetwood terminated approximately fifty (50) employees and High Country terminated approximately 14 employees (collectively, the "Terminated Employees").  On the Separation Date, the Debtors remitted payment to each of the Terminated Employees in an amount equal to (a) each Terminated Employee's accrued but unused PTO (as defined herein), plus (b) accrued and unpaid prepetition Wages (as defined herein) earned by each Terminated Employee through the Separation Date (the "Separation Payments").

$13,650 per Employee on an interim basis.

### a)      Wages and Salaries

48.      Prior to the Petition Date and in the ordinary course of business, the Debtors typically paid obligations relating to wages, commissions, and salaries for their Employees every two weeks in arrears (the "Wage Obligations").  The Debtors' last payroll payment was made on October 25, 2019 and covered the period from October 7, 2019 to October 20, 2019.  All Wage Obligations accrued before the Petition Date compensate Employees for work already performed. Accrued and outstanding Wage Obligations for the prepetition period aggregate approximately $185,269, all of which is scheduled to be paid on November 8, 2019. [7]

### b)      Payroll Processing Fees

49.      Certain Withholding Obligations for the Debtors' Employees are processed and administered by CheckmateHCM Solutions ("Checkmate").  The Debtors pay approximately $3,000 per month for such services.  As of the Petition Date, no amounts are due and owing to Checkmate on account of prepetition payroll services.  Approximately $3,000 is scheduled to be paid to Checkmate in connection with payroll obligations scheduled to be paid on November 8, 2019.

### c)      Payroll Taxes

50.      The Debtors are required by law to withhold from the Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").  In addition, the Debtors are required to make matching

---

[7] The payroll scheduled to be paid on November 8, 2019 will compensate current Employees for prepetition Wage Obligations accrued between October 21 and November 3, 2019.  The amount scheduled to be paid on November 8, 2019 does not include any amounts for prepetition Wage Obligations of Terminated Employees, which were satisfied in full through the Separation Payments.

payments from their own funds on account of social security and Medicare taxes, and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").   Approximately $70,000 in Employer Payroll Tax obligations relating to prepetition Wage Obligations are scheduled to be paid on November 8, 2019.

### d)    Expense Reimbursements

51.    The Debtors' Employees incur various expenses in the discharge of their ordinary duties, such as travel and meal expenses.  It is the Debtors' practice to reimburse Employees in full for reasonable expenses incurred in connection with such Employee's official duties and in furtherance of the Debtors' business (the "Expense Reimbursements"), provided that the Employee (i) submits an itemized receipt for the requested Expense Reimbursement and (ii) the Expense Reimbursement request is approved by the Employee's supervisor.

52.    In the six-month period prior to the Petition Date, Expense Reimbursements averaged approximately $54,000 per month.  The Debtors estimate that there is approximately $10,000 owed for Expense Reimbursements currently outstanding.  This amount is subject to increase, however, in the event that Employees have incurred expenses prior to the Petition Date but not yet submitted requests for reimbursement thereof.

53.    In addition, prior to the Petition Date the Debtors held company credit cards that Employees use to pay for corporate purchases and travel-related expenses (the "Company Credit Cards").  All purchases made using the Company Credit Cards must be authorized by the Debtors immediately prior to the point of sale for each transaction.  The Debtors believe it is necessary to allow payment of unpaid credit card balances, including any amounts owed for expenses incurred

prior to the Petition Date, as part of the Expense Reimbursements program and to enable the Debtors' Employees to conduct business in the ordinary course.  As of the Petition Date, approximately $15,000 is accrued and outstanding in connection with the Company Credit Cards.

      **e)**    **Commissions**

54.    The Debtors pay certain eligible Employees sales commissions in quarterly installments based on total sales for each Employee's assigned accounts (the "<u>Sales Commissions</u>").  As of the Petition Date, $35,000 in Sales Commissions payments for sales during the third quarter of 2019 are outstanding, all of which is scheduled to be paid during the Interim Period.  Sales Commissions for sales generated during the fourth quarter of 2019 are scheduled to be paid on or about February 15, 2020, including approximately $12,500 in Sales Commissions accrued prior to the Petition Date.

      **2.**    **The Debtors' Employee Benefits**

55.    In the ordinary course of business, the Debtors established various Employee Benefits for their eligible Employees that can be divided into the following categories: (i) paid time-off plans, including vacation days (the "<u>PTO Plans</u>"); (ii) insurance, including medical, dental, vision, life, AD&D, and short-term and long-term disability insurance (collectively, the "<u>Health and Welfare Plans</u>"); (iii) Flexible Savings Accounts and Health Savings Accounts (as defined herein); (iv) 401(k) Plans (as defined herein); (v) an assistance program in connection with Employee well-being (the "<u>Employee Assistance Program</u>"); (vi) payment of severance benefits to certain eligible employees; and (vii) miscellaneous other benefits (the "<u>Miscellaneous Benefits</u>").  The Debtors directly deduct specified amounts from Employees' wages in connection with certain of the Employee Benefits.

      **a)**    **Paid Time-Off Benefits**

56.    Under the PTO Plans, eligible Employees may receive their full wages for days not

worked ("PTO").  PTO may be used for any reason, including vacation, care for dependents, sickness, medical appointments, or other personal reasons.  Hourly and salaried full-time employees are eligible for up to twenty days (or one hundred and sixty hours) of PTO per calendar year, allocated to each eligible Employee on the first day of January of a given year based on years of credited service as of the 31st day of December of the preceding calendar year.  At the end of each calendar year, up to forty hours of unused PTO benefits may be rolled into the Employee's PTO benefits for the subsequent year, provided that the Employee's total PTO benefits may not exceed the applicable PTO cap, which ranges from forty to two hundred hours based on an Employee's years of credited service.

57.    In addition, the Debtors provide certain other forms of paid and unpaid leave, including, for example, (a) paid holidays, (b) leave under the Family and Medical Leave Act, (c)  military leave for voluntary or involuntary military service in conformity with applicable law, including the Uniformed Services Employment and Reemployment Rights Act, (d) jury duty, and (e) other paid and unpaid leaves of absence for personal reasons, including for bereavement and those required by law.  Importantly, these other forms of paid and unpaid leave do not involve incremental cash outlays beyond standard payroll obligations.

58.    In addition to Employees using PTO in the ordinary course of business, prior to the Petition Date, eligible Employees could convert accrued but unused PTO into an immediate cash payout upon retirement or terminations due to permanent layoff, job elimination, or substandard performance.  As of the Petition Date, eligible Employees have accrued approximately $35,600 in unused time in connection with the PTO Plans.[8]  Post-petition, the Debtors will not cash out PTO

---

[8] As previously indicated, the Debtors remitted payment to each of the Terminated Employees for all accrued but unused PTO time on the Separation Date.  Accordingly, the PTO balances accrued for Terminated Employees are excluded from the above amount.

other than as required by applicable law.  The Debtors request authority to continue honoring PTO obligations in the ordinary course post-petition.

### b)    Health and Welfare Plans

59.    The Debtors sponsor several Health and Welfare Plans to provide benefits to eligible Employees, including, without limitation, health related plans including but not limited to (i) medical insurance, (ii) dental insurance, (iii) vision insurance; (iv) life insurance; (v) short-term and long-term disability insurance, and (vi) other insurance plans including, but not limited to, business travel accident insurance and critical illness insurance.

### i.    Medical Insurance

60.    The Debtors offer eligible, full-time Employees and their families medical insurance coverage.  The Debtors self-insure their medical insurance coverage (the "Self-Insured Medical Insurance"), which is administered by Meritain Health ("Meritain").  Premiums for the Self-Insured Medical Insurance are partially covered by the Debtors, with the remainder paid for by each covered Employee as a deduction from the covered Employees' wages.  The Debtors then pay administrative fees to Meritain on a monthly basis to administer the Employees' Self-Insured Medical Insurance plans.

61.    Because the Debtors self-insure their medical plan, they assume the direct risk for payment of any claims for benefits under the Self-Insured Medical Insurance plans.  To mitigate the financial risk, the Debtors maintain stop loss insurance ("Stop-Loss Insurance") provided by Meritain.  Under the Stop-Loss Insurance, the Debtors are responsible for all claims exceeding the Employee's deductible under the Self-Insured Medical Insurance plans.  The Stop-Loss Insurance reimburses the Debtors for claims and expenses above $100,000 for each Employee, provided that a company-wide, one-time $50,000 aggregating specific deductible has been satisfied.

62.     Prior to the Petition Date, the Debtors paid approximately $18,000 to Meritain on a monthly basis in connection with the Self-Insured Medical Insurance and the Stop-Loss Insurance.  Payments are made in advance.  As of the Petition Date, approximately $20,000 is due and owing to Meritain in connection with the Self-Insured Medical Insurance and Stop-Loss Insurance.

63.     Medical claims asserted under the Self-Insured Medical Insurance (the "Medical Claims") are filed with Meritain, who, in turn, seeks reimbursement from the Debtors.  The Medical Claims are reconciled by the Debtors on a weekly basis.  Due to the lag time involved in medical billing, the Medical Claims paid in each weekly period arose, on average, 1.33 months before payment for such claim is made.

64.     Reconciliation of the Medical Claims to allow reimbursement to Meritain is necessary to ensure there is no disruption in services for Employees under their Self-Insured Medical Insurance plans.  Between January 1, 2019 and the Petition Date, weekly payments for Self-Insured Medical Claims have averaged approximately $370 per Employee.  As of the Petition Date, the Debtors estimate that approximately $275,000[9] will come due and owing on account of prepetition Medical Claims during the Interim Period.

### ii.  Dental Insurance

65.     The Debtors also offer eligible, full-time Employees and their families fully-funded dental insurance coverage (the "Dental Insurance") through a preferred provider organization plan for all eligible Employees and their dependents (the "Dental PPO Plan"), a health maintenance

---

[9] While the Debtors calculate average monthly payments of approximately $370 per Employee on account of Self-Insured Medical Claims, the Debtors note that large value claims can cause substantial variation in the amount paid on a monthly basis.  As of the Petition Date, the Debtors anticipate that two large claims, representing a total remaining liability to the Debtors of $220,000, will be paid in November.  Additionally, the Debtors anticipate payment of a high value, prepetition Medical Claim of up to approximately $90,000 in January 2020.

organization plan for eligible Colorado Employees and their dependents (the "Colorado DHMO Plan"), and a health maintenance organization plan for Pennsylvania Employees and their dependents (the "Pennsylvania DHMO Plan"). The Dental PPO Plan and the Pennsylvania DHMO Plan are administered by Sun Life Assurance Company of Canada ("Sun Life"), and the Colorado DHMO Plan is administered by United Dental Care of Colorado, Inc. ("United Dental"). Premiums for the Dental Insurance are fully paid for by each Employee as a deduction from the covered Employees' wages. Payments are made in advance. As of the Petition Date, approximately $975 is due and owing in connection with the Dental Insurance.

### iii. Vision Insurance

66.     The Debtors also offer eligible, full-time Employees and their families vision insurance coverage (the "Vision Insurance"). The Vision Insurance is fully funded and administered by EyeMed Vision Care in conjunction with Fidelity Security Life Insurance Company ("EyeMed"). Premiums for the Vison Insurance are fully paid for by each covered Employee as a deduction from the covered Employees' wages. As of the Petition Date, approximately $900 is due and owing to EyeMed in connection with the Vision Insurance.

### iv. Life and AD&D Insurance

67.     The Debtors purchase life and accidental death and dismemberment ("AD&D") insurance (the "Company-Provided Life Insurance") from Sun Life for each of their eligible, full-time Employees. In addition to the Company-Provided Life Insurance, Employees may also purchase from Sun Life optional life and AD&D insurance for themselves or their dependents (the "Optional Life Insurance"), the cost of which is deducted from the covered Employee's wages. The Debtors remit approximately $2,500 to Sun Life on a monthly basis in connection with the Company-Provided Life Insurance and the Optional Life Insurance. Payments are made in

advance.  As of the Petition Date, approximately $2,500 is due and owing for the Company-Provided Life Insurance and the Optional Life Insurance.

### v.  Long-Term and Short-Term Disability Insurance

68.     The Debtors provide eligible, full-time Employees with basic short-term disability insurance coverage (the "Company-Provided Disability Insurance").  The Debtors self-insure the Company-Provided Disability Insurance and, in connection therewith, receive "advice to pay" services from Sun Life.  In connection with the Company-Provided Disability Insurance, the Debtors pay a monthly fee of approximately $300 to Sun Life.  Payments are made in advance. As of the Petition Date, approximately $300 is due and owing to Sun Life in connection with the Company-Provided Disability Insurance.

69.     Because the Debtors self-insure the Company-Provided Disability Insurance, the Debtors also pay claims which accrue thereunder.  As of the Petition Date, approximately $7,000 is accrued and outstanding for prepetition claims in connection with the Company-Provided Disability Insurance, approximately $4,700 of which is scheduled to be paid during the Interim Period.

70.     Previously, the Debtors have provided certain long-term disability benefits through self-insured policies (the "Lapsed Long-Term Disability Insurance").  In connection with the Lapsed Long-Term Disability Insurance, the Debtors pay approximately $619 on a monthly basis to a former employee on account of a prepetition claim.  The Debtors request authority but not direction to continue honoring their obligations under the Lapsed Long-Term Disability Insurance.

71.     Employees may also purchase from Sun Life additional, voluntary short-term and long-term disability coverage (the "Optional Disability Insurance") through deductions from each covered Employee's wages.  The Debtors remit approximately $1,800 to Sun Life on a monthly

basis in connection with the Optional Disability Insurance.  As of the Petition Date, approximately $1,800 is due and owing to Sun Life in connection with the Optional Life Insurance.

### vi.  Workers' Compensation Insurance

72.     The Debtors provide workers' compensation insurance for their Employees at the level required by statute for each state in which the Debtors have Employees (the "Workers' Compensation Insurance Policies").  Coverage under the Workers' Compensation Insurance Policies is provided by National Fire Insurance Company of Hartford, a Stock Insurance Company and Valley Forge Insurance Company (the "Workers' Compensation Insurers").  Approximately $217 has been paid for claims filed under the Workers' Compensation Insurance Policies between April 9, 2019, which is the date the Workers' Compensation Insurance Policies went into effect, and the Petition Date.  The Debtors pay approximately $16,000 on a monthly basis in costs, including deductibles, associated with the Workers' Compensation Insurance Policies.  As of the Petition Date, there is approximately $32,000 due and owing to the Workers' Compensation Insurers in connection with the Workers' Compensation Insurance Policies.

73.     Certain benefits under the Workers' Compensation Insurance Policies may have been incurred prepetition but have yet to be fully paid, and certain other claims may have been filed prepetition but have yet to be resolved or not yet filed (collectively, the "Unpaid Workers' Compensation Claims").  For the claims administration process to operate in an efficient manner and to ensure that the Debtors comply with their contractual obligations, the Debtors must continue to assess, determine, and adjudicate Unpaid Workers' Compensation Claims during these Cases. In addition, to the extent any of the Employees assert claims under the Workers' Compensation Insurance Policies, the Debtors request that this Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers'

Compensation Insurance Policies.  This required modification of the automatic stay pertains solely to Unpaid Workers' Compensation Claims.

### vii.  Other Insurance Programs

74.    The Debtors purchase business travel accident insurance (the "<u>Business Travel Accident Insurance</u>") insurance from Arch Insurance Group ("<u>Arch</u>") for eligible, full-time Employees.[10]  The Business Travel Accident Insurance is fully funded.  The Debtors pay an annual premium of $1,500 to Arch for the Business Travel Accident Insurance.  As of the Petition Date, there are no amounts due and owing in connection with the Business Travel Accident Insurance, and no amounts will become due and owing during the Interim Period.

75.    Eligible, full-time Employees may purchase additional accident and critical illness insurance coverage (the "<u>Optional Accident and Illness Insurance</u>") from Unum Life Insurance Company of America ("<u>Unum</u>") through deductions from each covered Employee's wages.  Premiums for the Optional Accident and Illness Insurance are fully paid for by each covered Employee as a deduction from the covered Employee's wages.  In connection with the Optional Accident and Illness Insurance, the Debtors remit approximately $950 to Unum on a monthly basis.  As of the Petition Date, approximately $1,900 is due and owing to Unum on account of the Optional Accident and Illness Insurance.

### c)    Flexible and Health Savings Accounts

76.    The Debtors offer their Employees the option to contribute a portion of their pre-tax wages to a flexible savings account ("<u>FSAs</u>") and health savings accounts ("<u>HSAs</u>") for use on certain out-of-pocket medical and dependent care expenses.  Each Employee must determine at the beginning of each enrollment period the amount to put toward the FSAs and HSAs,

---

[10] Eligible Employees covered by the Business Travel Accident Plan include active, full-time Executives, Project Managers, Account Managers, and Contractors of the Debtors.

respectively.  The FSAs and HSAs are administered by Discovery Benefits.  The Debtors pay a

monthly fee of approximately $500 to Discovery Benefits in connection with the FSAs and HSAs.

As of the Petition Date, approximately $2,000 has accrued on account of prepetition services

provided by Discovery in connection with the FSAs and HSAs.

### d)        401(k) Plans

77.        The Debtors offer voluntary retirement plans in which eligible Employees may

elect to participate (the "401(k) Plans").  The 401(k) Plans are administered by Valley Forge

Investment Consultants, Inc. ("Valley Forge").  The 401(k) Plans allow for automatic pre-tax wage

deductions of eligible compensation up to the limits set forth by the Internal Revenue Code.

Prepetition, the Debtors matched an Employee's 401(k) Plan contributions at 1/3 of up to 3% of

Employees' eligible compensation (the "401(k) Contributions").  Generally, the 401(k)

Contributions are made by the Debtors just following each pay date.  Approximately $1,700 in

401(k) Contributions will be paid in connection with the payroll scheduled to be paid on November

8, 2019.  Additionally, as of the Petition Date, the Debtors believe that no prepetition fees are due

and owing to Valley Forge in connection with the 401(k) Plans.

### e)        Employee Assistance Program

78.        The Debtors provide to Employees and their families confidential assistance and

support on a comprehensive range of issues, including personal, family, or work-related issues,

through access to professional counseling services (the "Employee Assistance Program").  The

Employee Assistance Program is available to Employees and their immediate family members and

is intended to provide assistance in the form of problem assessment, short-term counseling, and

referral to appropriate community and private services for additional support at no out of pocket

cost to Employees.[11]  The Employee Assistance Program is administered by Guidance Resources, which is a division of Sun Life.  The Debtors pay a monthly cost for the Employee Assistance Program equal to $0.041 per every $1,000 of life insurance coverage provided through the Company-Provided Life Insurance plans.  As of the Petition Date, approximately $1,000 is due and owing in connection with the Employee Assistance Program.

 **f)**  **Severance**

79. Prior to the Petition Date, the Debtors maintained a severance program for the benefit of certain eligible, full-time Employees (the "Legacy Severance Program").  Pursuant to the Legacy Severance Program, the Debtors' practice was to offer eligible Employees, upon termination and on a discretionary basis, severance payments at base compensation levels, excluding deductions, for between two and thirteen weeks following the date of termination depending on years of credited service.  Notwithstanding the Legacy Severance Program, certain Employees were entitled to receive additional severance amounts in accordance with the terms of their employment contracts.  As of the Petition Date, the Debtors have terminated the Legacy Severance Program.

80. In connection with the prepetition layoffs, the Debtors propose to pay severance benefits to the Terminated Employees equal to two weeks of each Terminated Employee's base compensation, excluding deductions (the "Terminated Employee Severance Program").  In connection with entry of the Final Order, the Debtors seek authority to pay approximately $200,000 in accordance with the Terminated Employee Severance Program to the Terminated Employees during the pendency of these Cases.  Additionally, the Debtors seek to offer severance

---

[11] Additional public and private services recommended through the Employee Assistance Program may impose out of pocket expenditures and require the use of insurance.  For the avoidance of doubt, costs of such additional services (beyond what is available through the Employee Assistance Program) is needed, the costs of such services will be the Employee's sole responsibility.

benefits to any eligible Employee terminated without cause after the Petition Date in an amount equal to two weeks base compensation, excluding deductions, consistent with the Terminated Employee Severance Program.

### g)   Miscellaneous Benefits

81.     The Debtors provide all Employees covered under the Self-Insured Medical Insurance with access to a virtual care provider platform (the "Virtual Care Benefit").  To the extent an Employee is enrolled and covered under the Self-Insured Medical Insurance, all costs associated with the Virtual Care Benefit are funded by the Debtors.  To the extent an Employee is not covered under the Self-Insured Medical Insurance and wishes to have access to the Virtual Care Benefit, all costs associated with the Virtual Care Benefit are funded by such Employee through deductions from such Employee's wages.  The Virtual Care Benefit is provided and administered by New Benefits, Ltd. ("New Benefits").  Prior to the Petition Date, the Debtors paid New Benefits approximately $800 per month in connection with the Virtual Care Benefit. Payments are made in arrears.  As of the Petition Date, approximately $800 has accrued on account of prepetition services provided by New Benefits in connection with the Virtual Care Benefit.

### 3.   Honoring Employee Obligations is Critical

82.     Any delay or failure to pay wages, salaries, benefits, and other similar items would irreparably impair the Employees' morale, dedication, confidence, and cooperation and adversely impact the Debtors' relationship with their Employees at a time when the Employees' support is critical to the success of these Cases.  At this early stage, the Debtors simply cannot risk the substantial damage to their business that would inevitably attend any decline in their Employees' morale.

83.     Absent an order granting the relief requested herein, the Employees will suffer

undue hardship and, in many instances, serious financial difficulties, because the amounts in question are critical to certain Employees' ability to meet their own personal financial obligations. Without the requested relief, the Debtors' stability will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal Employees will pursue alternative employment.   In addition, it would be inequitable to require the Debtors' Employees to bear personally the cost of any business expenses they incurred prepetition for the benefit of the Debtors in reliance on their understanding that such expenses would be reimbursed.

### G.    Motion Authorizing the Payment of Certain Prepetition Taxes and Fees

84.    The Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors, in their sole discretion, to remit and pay certain outstanding prepetition taxes.

85.    In the ordinary course of business, the Debtors incur or collect and remit certain taxes including sales, use, franchise, business and occupation, and various other taxes, fees, charges, and assessments (the "Taxes and Fees").  The Debtors remit such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in connection with the operation of their business and the sale of their products or services.  The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.  As of the Petition Date, the Debtors estimate that they owe approximately $200,000 in unremitted Taxes and Fees, which are comprised entirely of current tax obligations, and are not in respect of "catch-up" payments.

86.    The Debtors seek authority to pay all prepetition Taxes and Fees in the ordinary course of business owed to the Taxing Authorities, including $200,000 on an interim basis and an additional $225,000 on a final basis.

87.     The continued payment of the Taxes and Fees on their normal due dates will ultimately preserve the resources of the Debtors' estates.  If such obligations are not timely paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws, including whether the obligations are proratable or fully prepetition or postpetition, and whether penalties, interest, and attorneys' fees and costs can accrue on a postpetition basis, and, if so, whether such penalties, interest, and attorneys' fees and costs are priority, secured, or unsecured in nature.

88.     Further, I have been advised that certain Taxes and Fees may constitute "trust fund" taxes that are not included in property of the Debtors' estates, and/or obligations as to which the Debtors' officers and directors may have personal liability in the event of nonpayment.  Efforts by Taxing Authorities to collect such taxes would result in obvious distractions to the Debtors and their officers and directors in their efforts to reorganize.

89.     Finally, certain Taxing Authorities either have not been paid or have been sent checks and/or wires for Taxes and Fees that may or may not have been presented or cleared as of the Petition Date.  Similarly, in other cases, obligations have accrued or are accruing, or are subject to audit or review, but have not yet become due and payable.  Accordingly, the Debtors seek authorization for their banks to honor prepetition checks and wires issued by the Debtors to the Taxing Authorities in payment of prepetition Taxes and Fees that, as of the Petition Date, have not cleared or been transferred.  In addition, to the extent the Debtors have not yet sought to remit payment to the Taxing Authorities with respect to certain Taxes and Fees, the Debtors seek authorization to issue checks or provide for other means of payment to the Taxing Authorities as necessary to pay the Taxes and Fees.

90.     I believe that it is in the best interest of the Debtors' estates that the Taxes and Fees be paid on time so as to avoid any disruptions.  Delayed payment of the Taxes and Fees may cause the Taxing Authorities to take precipitous action, including a marked increase in state audits, lien filings, and significant administrative maneuvering at the expense of the Debtors' time and resources.  Prompt and regular payment of the Taxes and Fees will avoid this unnecessary governmental action.

**H.      Motion Authorizing the Continuation and Payment of Prepetition Obligations Incurred in Connection with Various Insurance Policies**

91.     The Debtors seek entry of interim and final orders (i) authorizing, but not directing, the Debtors to continue and, to the extent necessary, revise, extend, renew, supplement, or change the Debtors' prepetition insurance policies (each, an "Insurance Policy" and, collectively, the "Insurance Policies"), or enter into new policies, if necessary, in the ordinary course of business and pay prepetition obligations in respect thereof and, (ii) authorizing banks and other financial institutions (collectively, the "Banks") to honor and process check and electronic transfer requests related to the foregoing.

**1.      Overview of the Insurance Policies**

92.     In connection with their business operations, the Debtors maintain multiple Insurance Policies that vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtors operate and various contractual obligations.  The Insurance Policies include (a) property and general liability, (b) automobile liability, (c) umbrella liability, (d) manufacturing errors and omissions, (e) pollution, (f) cargo, (g) directors and officers liability, and (h) workers' compensation and

employers' liability.[12]

93.     The total annual premiums under the current Insurance Policies are approximately $235,000, including all related fees and charges.  These premiums are paid to the relevant Insurance Carriers either as annual prepayments or as installment payments.  The Debtors do not believe there are any prepetition amounts owing to the Insurance Carriers with respect to the Insurance Policies.  In an abundance of caution, the Debtors seek authority to pay any prepetition amounts in respect of the Insurance Policies, in an amount not to exceed $50,000 on an interim and final basis, and to continue to pay post-petition costs with respect to the Insurance Policies in the ordinary course of business during the pendency of these chapter 11 cases.

### 2.    Brokerage and Administrative Services

94.     In connection with the procurement and maintenance of their Insurance Policies, the Debtors obtain brokerage services from Lockton Companies, Inc. (the "Broker").  The Broker assists the Debtors in obtaining comprehensive insurance for the Debtors' operations by, among other things, assisting the Debtors with the procurement and negotiation of the Insurance Policies, and enabling the Debtors to obtain those policies on advantageous terms and at competitive rates. Historically, the Debtors have paid the Broker on an annual basis for its services (the "Brokerage Fees"), the Debtors do not believe there are any outstanding Brokerage Fees as of the Petition Date.  Thus, the Debtors seek authority only to continue to pay post-petition costs with respect to the Brokerage Fees in the ordinary course of business during the pendency of these Cases.

---

[12]  Contemporaneously herewith, the Debtors are filing a motion relating to the Debtors' employee compensation and benefits programs (the "Employee Wages Motion").  The Employee Wages Motion seeks, among other things, authority to continue to provide various benefits, including applicable insurance coverage, for employee health and welfare programs.  These programs and policies are not listed on the Insurance Schedule, and the maximum allowances for payment of prepetition insurance obligations listed in this Motion are exclusive of any amounts for which payment authority may be sought in the Employee Wages Motion.

### 3.    Continuation of the Insurance Policies is Critical

95.    Continuation and renewal of the Insurance Policies and entry into new insurance policies, if necessary, are all essential to preserving the value of the Debtors' business and assets. Moreover, in certain cases, I understand that the Debtors are required by law to maintain certain types of insurance coverage.

96.    I believe that the relief requested in the insurance motion is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any other form of impairment to the coverage, benefits, or proceeds provided under any Insurance Policy.  Any lapse in insurance coverage could expose the Debtors to substantial liability for damages and negatively impact the Debtors' reorganization efforts by exposing their estates to unnecessary risk of loss.

### I.    Motion Authorizing the Payment of Prepetition Claims of Critical Vendors

97.    The Debtors seek interim and final orders authorizing them to pay, in the reasonable exercise of their business judgment and in their sole discretion, the Critical Vendor Claims, or a portion thereof, described herein that are essential to the uninterrupted functioning of the Debtors' business operations and who are not bound by contractual agreements with the Debtors.  The Debtors have proposed cap of $1,000,000 on payments to critical vendors in the interim period and a cap of $1,500,000 following entry of the final order.  Additionally, by the Critical Vendor Motion, the Debtors seek interim and final orders authorizing all applicable banks and financial institutions to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtors related to the Critical Vendor payments, whether such payments were presented or electronic requests were submitted before or after the date hereof.

98.    Before filing the Critical Vendor Motion, the Debtors, in consultation with their professionals, reviewed their accounts payable and undertook a process to identify those vendors truly essential to their operations.  Thus, the Debtors concluded that each Critical Vendor is

absolutely critical as a sole source or otherwise irreplaceable provider. Any disruption in the supply of the goods or services provided by any Critical Vendor would likely result in immediate and irreparable harm to the Debtors' business and their estates by forcing them to divert resources to establish alternative sources for the applicable goods and services.

99.    In making the determination that a given vendor is a Critical Vendor, the Debtors consulted with appropriate members of its management team to identify those vendors essential to their operations using the following criteria: (i) whether the vendor in question is a "sole source" provider; (ii) whether certain product-customizations prevent the Debtors from obtaining goods or services from alternative sources within a reasonable timeframe; (iii) if a vendor is not a sole source provider, whether the Debtors have sufficient goods in inventory to continue operations while a replacement vendor is procured; (iv) whether the Debtors have favorable pricing and other terms with the vendors that would be lost if the Debtors were to switch to a new vendor; (v) whether a vendor considered essential to the Debtors operations under the criteria in (i), (ii), (iii), or (iv) is likely to refuse to continue providing goods or services postpetition if its prepetition claims are not paid; and (vi) whether the vendor might be able to obtain (or has obtained) mechanics liens, possessory liens, shippers liens or similar state law trade liens on property of the Debtors' estates.

100.    Broadly speaking, the Critical Vendors fall into two major categories.  The first major category consists of suppliers of raw materials and other parts from which the Debtors manufacture their products.  Among other reasons, in many instances it would be highly disruptive to the Debtors to replace the critical suppliers because, under the Debtors' contracts with their customers, the customer must approve any change in the supplier of materials.  Additionally, certain suppliers are in possession of finished or partially-finished goods that have not yet been delivered to the Debtors, heightening the likelihood that those suppliers may assert possessory or

similar liens over the undelivered goods.  The second major category are the Debtors' installers. In most instances it would be extremely difficult for the Debtors to replace their installers because the installers have developed strong working relationships with the Debtors' customers and in many ways act as the on the ground face of the Debtors' business.  Additionally, the installers have experience working with the Debtors' materials and designs and it would be difficult and costly to get any replacement installers trained appropriately.

101.    It is essential that the Debtors be authorized in their sole discretion to pay the Critical Vendor Claims to ensure the uninterrupted functioning of the Debtors' business operations.  Accordingly, the authority requested in this Motion is required to maximize the value of the Debtors' assets.

**J.    Motion to Use Cash Collateral and Provide Adequate Protection**

102.    It is essential that the Debtors obtain post-petition authority to use cash collateral, as that term is defined by section 363 of the Bankruptcy Code

103.    Without the use of cash collateral, the Debtors will not have the funds necessary to maintain their assets, pay employees, payroll taxes, inventory suppliers and other vendors, overhead, and other expenses necessary for the operation of a value-maximizing chapter 11 process.  Accordingly, without immediate access to Cash Collateral, the Debtors could suffer substantial and irreparable harm.

104.    The orderly continuation of the Debtors' operations and the preservation of their going concern value is largely dependent upon their ability to regularly convert prepetition collateral into cash collateral and use it to support the Debtors' business operations.  Among other things, cash collateral will be used to fund the Debtors' payments to vendors and employees and to satisfy ordinary costs of operation, including rent, taxes and insurance.  Without such access to

liquidity, the Debtors' ability to navigate through the chapter 11 process will be jeopardized, to the detriment of all of the estates' stakeholders. As a result, the Debtors have an immediate need to use cash collateral to ensure sufficient liquidity throughout the pendency of these chapter 11 cases. Absent authority to use cash collateral, the Debtors, their creditors and estates generally will suffer irreparable harm because the Debtors would immediately cease operations, which, in turn, would cause an immediate and pronounced deterioration in the value of the Debtors' business. Thus, the Debtors' access to Cash Collateral is absolutely necessary to preserve and maximize value for the benefit of all of the Debtors' stakeholders. In conjunction with this request to use cash collateral, the Debtors formulated the budget attached to the Interim Order (the "Budget"). The Debtors believe that the Budget will provide them with adequate liquidity. The Budget contains line items for each category of cash flows anticipated to be received or disbursed during the time period for which the Budget is prepared. I believe that the Budget includes all reasonable, necessary, and foreseeable expenses to be incurred in connection with the operation of the Debtor's business for the period set forth in the Budget.

105.    Moreover, the Interim Order was negotiated in good faith, and its terms and conditions are reasonable under the circumstances. The proposed Interim Order provides the Prepetition Secured Lender with reasonable and sufficient adequate protection to protect it from any diminution in value of its interests in the prepetition collateral during the pendency of these chapter 11 case. The Debtors intend to provide the Prepetition Secured Lender with adequate protection, which includes: (a) allowed superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code; (b) replacement liens on the Prepetition Collateral and all other of the Grantor Debtors' now-owned and hereafter-acquired real and personal property, assets, and rights of any kind or nature, wherever located, including, without limitation, all prepetition and

postpetition property of the Grantor Debtors' estates, and the proceeds, products, offspring, rents, and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, and all claims or causes of action or the proceeds thereof to avoid a transfer of property (or an interest in property) or an obligation incurred by the Grantor Debtors pursuant to any applicable section of the Bankruptcy Code, including, without limitation, chapter 5 and section 724(a) of the Bankruptcy Code (collectively, the "Senior Adequate Protection Collateral"), however, the replacement liens remain junior to any valid, perfected, and enforceable Prepetition Permitted Liens, if any exist, that are senior to the Prepetition Secured Lender's liens or security interests; (c) fully perfected junior liens on and security interests in all prepetition and postpetition property of the Grantor Debtors on any property of the Debtor upon which valid, perfected, and enforceable Prepetition Permitted Liens senior to the Prepetition Secured Lender's liens or security interests exist; (d) adherence to the Budget, subject to certain permitted variances; (e) maintenance of the Prepetition Collateral; (f) maintenance of the Debtors' existing cash management system and certain insurance of the Prepetition Collateral; and (g) payment of certain reasonable professional fees, expenses and disbursements incurred by the Prepetition Secured Lender.

106.    The proposed adequate protection package is sufficient and reasonable under the circumstances of this case, where the Debtors' budget projects that the Debtors will remain cash flow positive.  Accordingly, I believe that the Prepetition Secured Lender's interests in the cash collateral will be adequately protected.

### NEED FOR RELIEF SOUGHT IN FIRST DAY MOTIONS

107.    The Debtors' estates would suffer immediate and irreparable harm absent the immediate ability to use cash collateral to make certain critical payments and otherwise continue operating in the ordinary course of business as sought in the First Day Motions. In my opinion,

approval of the relief requested in the First Day Motions will minimize disruptions to the Debtors'

operations, thereby preserving and maximizing the value of the Debtors' estates for the benefits of

their creditors, employees and customers.

108.    Accordingly, I respectfully request that the Court grant all of relief requested in the

First Day Motions and such other and further relief as may be just and appropriate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true correct.

Shoemakersville, PA                     */s/ Octavio Diaz*_____
November 4, 2019                        Octavio Diaz

                                        *Chief Restructuring Officer to the Debtors*

## EXHIBIT A

